Next appeal is Docket 23-1027 CQV Co., Ltd. v. Merck Patent GmbH Mr. Geiger, you reserved four minutes for rebuttal, right? That's correct. Okay, please begin. Please start with standing. May it please the Court, I was actually going to start with standing. I assume based on this Court's April 12th order that that is something you're very interested in hearing about. Let's do it. So pursuant to your order, you ask that we submit declarations offering greater specificity regarding the injury, in fact, asserted by CQV giving rise to Article 3 standing here. And the supplemental declaration of Mr. Choi, we believe, does that. What it does, it gives greater detail about contacts between Merck and CQV's customers. In particular, it provides several notices by Merck. What do you think is your strongest evidence to support constitutional standing? I'd say it's a combination of a couple of things. One, the letters themselves showing that Merck believes that the product that is being sold by CQV to these customers potentially infringes the patent or publication of the application that led to the patent. With the case of the first four of those letters, that's Exhibit A. You're talking about the letters to foreign customers and distributors, not to customers, distributors in the United States, right? That's correct. Although, I will say, the letter itself, by its term, says this is not limited to your local market. It mentions infringement in the United States and China and other jurisdictions. If you look at Exhibit A, it says we know goods tend to move out of your local market when you look at everything. And Merck's counsel argues that we're very careful not to threaten litigation in that letter or those letters, but that's not the standard. Our group, the British Telecoms, which they rely upon, say that declaratory judgment action cannot be defeated simply by the stratagem of a correspondence that avoids magic words such as litigation or infringement. I'll also submit here that these letters do mention that the products may constitute infringement of these applications, and at least for the first four, the European ones, give a set time to respond to the letter. What about your indemnity agreement with Exalta? That sounds pretty interesting. Yeah, so that is the second big piece here. So we think the letters establish that Merck believes that there's potential infringement here. The indemnity agreement is what actually makes this personal to CQV. How do we know that the indemnity agreement was spurred on by contacts by Merck to Exalta about your products? I don't know that there's enough in the record to establish that. Through the listing in the appendix to the indemnity agreement? The indemnity agreement does not list the patent itself, which was not issued at the time of the indemnity agreement, nor does it list the patent publication, which was. However, the indemnity agreement is open-ended. Merck's counsel argues that even though it says it's not limited to the enumerated IT in the agreement, that it may not necessarily be open-ended. I don't see a reading of that that would suggest that. What that does is if this customer is sued for infringement of Merck's patent, based on our read of the agreement, CQV would be required to indemnify. And so those two pieces of evidence together, I think, are our strongest evidence of standing. If there are no other questions about standing, I'd like to move on to the substantive agreement at my remaining time. All right. So substantively, this case, I think the main issue on appeal here is whether or not there was substantial evidence for the board's finding that the Xuralic samples tested by CQV were publicly available prior to the critical date. Can you specifically identify the evidence you contend that the PTAB did not consider that might affect the outcome? Yes, Your Honor. So it's less that we think that they didn't consider the evidence, although there is certainly some elements of Merck's employees' testimony, this is Mr. Furch, that the board did not explicitly consider in the opinion. However, I think what we would say is more that the board did not take into account the totality of the evidence that had been presented by CQV. They focused primarily on Mr. Choi's declaration, which I think is very important, but ignored how Mr. Furch's testimony corroborated that declaration. So, for example, Mr. Choi said in a statement that they had purchased or obtained this sample in October of 2011 from a former Merck distributor, and the board found that that was not enough. However, you put that in combination with Mr. Furch's testimony that the lot numbers of the samples have two-digit code that corresponds to the year of manufacture, that Merck would make these things available, these lots available for sale as soon as quality assurance period ended. That's the piece of evidence that we didn't see the board actually comment on, right? There's two pieces. One is the fact that Merck's witness said that these lots, these batches, these samples, they go onto the market after quality control. And then your second piece of evidence that the board didn't expressly talk about was the fact that for you, CQV, your corresponding pigment products take two to three weeks to go through quality control. Indeed, Your Honor, and it does strain credulity that quality control would take more than four years, for example, which is what it would require in order for these products not to have been available prior to the critical date, considering we have a manufacture date of 2007 and then a critical date depending on, this was actually not decided by the board. The other side says we have case law that says you don't have to, the board isn't necessarily required to actually expressly talk about every piece of evidence that's in the record to render a defensible ruling. Your Honor, I think that's true. They don't have to talk about it. However, there still has to be substantial evidence to support their finding and here we think there isn't. The only other, we think that's the only inference that you can draw from the evidence that's in the record is that it was publicly available before the priority date. They say it could have been for internal experimental use or something. I understand that that's what they say, but there's no evidence in the record to support that. There was no, Merck provided no evidence that this was something that was even an option for the use of samples. What about the fact that they, I'm sorry, they say that you provide the evidence on the quality control in that two to three weeks based on your products as opposed to theirs. What's your response to that? Well, that's certainly true. However, I think it does give a good benchmark for what might be reasonable in the industry. And again, I think it was. Why? I mean, just because you say so, I mean, you've got to give us a little more. Understood, Your Honor. The products themselves are very similar. Clearly, Merck is of the view that they're very, very similar. We think that quality control of this type of product would take pretty much the same regardless of who makes it. Now, of course, some companies may have different exacting standards, but given the ten-year shelf life for the product and the fact that customers, as Merck's witness testified, are interested in this shelf life for the products, we don't think it would take four years to conduct a quality assurance review. My understanding is that you agree that the PTAC could focus on sample C. But I'm seeing something different in the briefing, implying that maybe there needed to be stuff on other samples as well. Can you respond to that, too? Yes, Your Honor. So, before the Board, if you look at the hearing transcript, the context of that statement was based on substantively whether or not sample C was representative of the physical properties of the product. And whether it alone would suffice substantively to show that the products with these characteristics were available. What wasn't in that line of questioning or considered at that time was the public availability aspect, which sample C is not necessarily representative. There are different pieces of evidence for different samples. If you look at the samples that are listed, D and E, for example, for those samples, there are specific certificates of analysis, Merck's certificate of analysis, that are directed to those lots. So, in our read of that transcript, at least from CQV's perspective, they were only agreeing to that from a substantive perspective, whether or not the... I think I'm about to be in my rebuttal time, but I want to answer your question because you seem dubious. No, I just want to have a question about claims 18, 19, 20, and 22. As I understand it, none of your attacks as to those claims relied in part on the ceralic product being prior art. So, even if we were able to prove that the product was prior art, it would still be prior art. If we were to vacate and remand on the claims in which the ceralic product was asserted as prior art, that wouldn't affect claims 18, 19, 20, and 22. Is that right? That's the case, Your Honor. So, you ask for a vacate and remand, but you're not asking for a vacate and remand as to those claims, as you couldn't possibly be. So, at best, you're asking for a vacate and remand as to those claims. Yes, Your Honor. Okay, very good. Let's hear from the other side. May it please the Court. Your Honors, I think I'll also start with standing. I think it probably helped the Court the most. There's eight customers involved, and there are long paths through this, and there are short paths through this. So, I will try to give you what we think is the shortest path. Their claim for standing is derivative, so they either have to show that they have some sort of liability for indirect infringement, they don't have to admit it, or they have to show indemnification. On the first branch, that they have some sort of liability, they have not said in their declarations, they said in their blue brief, but in the evidence, no contacts by CQV with the U.S., no sales into the U.S., no allegations that they do anything that could possibly be interpreted as an inducement, a contribution, any of that. So, there's a lack of U.S. content by them in the evidence. So, on their indirect infringement, there's nothing there for any of these customers. The customer letters that go to Europe or Korea, don't they indicate that these goods can easily travel, and so the theme of the letter is that that's why we're listing all of our patent rights across eight different countries, because even though you may be operating in a few different countries, we want to let you know how we, Merck, have patent rights worldwide, and we're doing heavy market surveillance, and these goods can travel from jurisdiction to jurisdiction. So, in that sense, maybe the letter is a little bit more broad, including the United States, given that all of these letters explicitly cite several U.S. published applications. Okay, so I have multiple answers to that. First, it does not affect their derivative standing. Perhaps, and I'll get to the customers not having standing, but perhaps the customers have standing. Perhaps the distributors, whatever distributors, they've mentioned distributors that operate in the U.S., could have derivative standing, but that does not give CQV standing, because CQV is not said that it's a derivative. It's just that it does anything in the United States or directed toward the United States. They may sell in Korea without anything other than that to a company that then brings it into the United States. It's their burden to show that they have something directed to the United States. They haven't. So, that's the first answer to that. The second is, all of those letters, the European and the Korean letter, those customers have not indicated that they sell in the U.S. or intend to sell in the U.S. So, this is kind of like the early, you know, the early, you know, the early cases about jet engines, right? There was a first jet engine case where they said, well, we'd like to make a jet engine. Well, there was no standing there because they weren't prepared to make a jet engine. They weren't on the cusp of it. It was just out there. The second one, they said, we are prepared to make a jet engine, and therefore, there was standing. Here, there is no evidence that the Korean company or the European companies want to enter the U.S., intend to enter the U.S., intended to enter the U.S., if they hadn't gotten the letter. Nothing of that. There's just the letter. There are other problems. The red letter doesn't identify their product, doesn't identify them. A lot of the letters don't identify the U.S. as a relevant jurisdiction. None of the European letters do. But I think the fundamental issue with the foreign, the non-U.S. companies is that none of those companies are alleged to be interested in the U.S. And so, they don't even have initial standing. So, they can't piggyback off that standing. So, that kind of thing. That gets us to indemnification, the other possible way. I think the only serious possible indemnification is the agreement that they attached. And there's multiple problems there, mainly with the customer standing. So, we'll just move away from the indemnification agreement. We have arguments on that. We provided them. There's no timing on when assertions were made against that customer, as far as the only argument from them. Is there a requirement in the law for the patent infringement assertion to be at a particular time? I'm thinking of a case like Grit Energy. I don't recall in that case. So, long as the patent is still in existence, the letter is good until it's formally withdrawn by the patent. So, two answers for that. It has to be imminent. And then, this only refers to assertions of the application or the publication. The publication occurred in 2014. The patent didn't issue until 2020. The agreement they've provided is 2018. So, nothing on the issued patent. Those claims were amended in 2018 and 2019. First, to add the limitation that it be from 150 to 400. It used to be 500 or under for thickness. Also, to add the D10 limitation. And then, the second amendment to the patent, right before it was allowed in 2020, but the amendment was made in 2019, was to add the alpha alumina limitation. So, whatever was going on here, we don't know what was said to that customer. There's just a vague allegation. But, whatever was going on likely occurred before the claims were amended. So, that reset the framework. And the fact that we've now gone four years since the patent is issued and nothing has changed, I think it's a good thing. A couple years ago, there was a lawsuit filed in Korea, right? Not against that customer. Not against any of the other customers. But, it's asserting that CQV's atomist product is infringing the Korean patent. Right. And, it's too late. But, they say, well, you know, it could reflect. It could reflect back. I think the analysis for that, it really kind of... I understand that it's a confirmatory, at best, type of evidence. But, nevertheless, as I understand it, the Korean, the Korean patent is being asserted, has the same kind of claim about these aluminum... Well, we don't know. ...and having the same dimensions of thickness and diameter. That's fuzzy. I'm not saying that we're going to argue that hard, but that's fuzzy and they have the burden. Right. I understand. I mean, we have a translation now. Machine translation that they admit is... We don't have a counter translation from you. We don't have a burden. Okay. Fine. Can we get to the merits? Sure. I think the easiest route through the merits, the central problem they have is they're seeking vacature on using multiple pieces of circumstantial evidence. And, they're up against a substantial evidence standard of review. I think the fundamental problem, as I listen here and as I look at the theme in their reply brief, is we think they misunderstand what the substantial evidence standard of review is. They think there has to be evidence on our side. We do have evidence, but I want to talk about the legal point first. That there has to be evidence on our side for there to be substantial evidence. And, it sounds good when you first think of it, but it's not true. We understand if there's a failure of proof on their side to meet their burden, then that's the end of the game. You don't have to put on a counter case. So, let's talk about why the board could find a failure of proof on their side. The big point that they have to link up is the data manufacturer with some data sale. Right off the top, corroboration is a problem. We heard for the first time today that Mr. Fritsch corroborated somehow Mr. Chow. He did not. There's no corroboration there. They did not say anything about corroboration in the reply. So, they have a lack of corroboration for this sample. Do you agree that the evidence that CPV put forth regarding the two to three weeks with respect to quality control is unrebutted? Unrebutted and irrelevant. It relates to their system. Their system is not evidence of what the industry does. But, I think more fundamentally, I don't want to hang the whole case on that because I think more fundamentally, fine, if they actually had evidence that this sample entered quality control on date X and two years passed or something, that might be a different case. But, they don't have that. All they have is a manufacturing date. They have a testimony. They have two pieces of testimony. One that says when it gets out of quality control, it's available. And one that says in this other company's system, not in the industry, but in this other company's system, it's two to three weeks in quality control. But, they don't have any evidence to show that it went into quality control. They say, well, we speculate that it didn't. I would say they speculate that it did. It's their burden. Are you contending, though, that CQV's product is substantially similar to Merck's product? I don't think there's any evidence. I don't think they've said anything about what their product is. I think the most they have is that it competes with our product. I don't think they've ever said a word in any of the declaration about what their product is. I guess the concern I have is that one way to read the board's opinion is that the board was demanding some form of direct evidence and that the circumstantial evidence would not be enough. I mean, we do have some interesting clues in the record. We know the manufacture date. Is that right? No. We don't know the manufacture date. No. Well, it's unrebutted, is it not, that 2007 is the manufacture date here for sample C? No. Well, unrebutted or admitted. This goes to the standard review. I understand. But, okay, where in the record is there something that suggests that sample C was not manufactured in 2007? It comes completely from Mr. Choi's testimony that is not corroborated. Okay. But it's not rebutted. There's not counter evidence on the manufacture date. This reminds me of something. There's a decent amount of material that's been identified as confidential, has been marked confidential, and it feels a little inconsistent. I mean, there are times where I see in the briefing discussion of lot numbers that are not marked confidential, and then there are other times that there are. It would be very helpful, should we need to write an opinion here, most likely we do, that we get better clarification. Yes. I think for purposes, I don't think you're going to have to go that deep, and if you do for some way, we're okay with that. I think it's, there was confidentiality on that, and then along the way in the initial decision and certain things got published, and so that's the story of how we got here. But I think I can say to the court, write your opinion as you need to. Okay. If that helps. Great. So, okay. As far as I know, that the board did not seem to challenge or dispute the idea that there was a manufacture date of 2007, that the expiration of these products is 10 years, but I didn't see the board discuss or acknowledge your witness's statement that as soon as these products go through quality control, they go out onto the market. And then the second piece of evidence, of course, is that CQB's own corresponding product, it goes, it takes two to three weeks to go through quality control. And so, I guess the concern I have is that there is a story there. It's not direct evidence, it's circumstantial evidence, but there's a collection of clues that could lead a reasonable fact finder to reach a result that the board didn't make, but the board didn't address all of the fact points. And so, can you explain to me why we shouldn't vacate? Sure. So, I think if you go to page 29 of the board's opinion, I won't quote in detail, but this is in theory, but not in fact. Right. This is the one paragraph on this point. And so, they're saying even if the incentive existed, so they're talking about this timing issue and all of that. They say even if that existed, what they're saying with the in theory and fact is, your proof relates to what generally happens, and we don't think it's enough to show what happened with this sample. We think there's both evidence to support that, lack of corroboration for when the sample was sold, or whether it even was a sample, failure to link up the manufacturing date with the QC date, failure to show certificates of analysis when they had certificates of analysis. That's actually positive proof for our side. We have certificates of analysis for other products that were sold publicly, but we don't have a certificate of analysis for this one. That's positive evidence on our side. And so, we think all of that supports that. To be fair, that's loading a lot into what this paragraph actually says. So, we don't know if the board found anything that you just said to be persuasive. So, let me give you a legal link that I think hooks even better to this. The in theory and fact is the three cases we show that say that evidence about what generally happens is not evidence about what happened in a specific instance. So, evidence about what a workflow might generally be more than 50% of the time, samples move through the workflow. That is not evidence, and certainly not JMAL level, reversal on a substantial evidence standard. Certainly not that level of evidence. And the three cases we discuss on that I think are relevant. They're not limited to statistical evidence, whatever that means. More likely than not is statistical evidence. But those cases express this idea that you cannot use evidence about what generally happens to substitute for evidence of what happened in a particular circumstance. But what if we read those cases that you cited as really being more about there are a plausible set of possibilities that could have happened. Possible alternatives. And we don't have any real confidence as to which of the alternatives actually is true. And in that way, you can't say that the plaintiff or the petitioner in that instance met its burden of proof just because there's a statistical likelihood that option A was the thing that actually happened over option B. In this particular instance, as far as I can tell, we don't have a menu of options of what could have happened here with sample C. As far as I know, we only have one option. We're not really sure if that option is in fact true. But it's not like, okay, then there was another alternative. I know in your briefing to us, you talk about the idea that maybe this is just some internal use sample for experimental purposes or otherwise. But I don't think that was in the record. I don't think the board had in front of it that 95% of the time samples that get manufactured by Merck go to market. But there's 5% that don't and so we at the board have no confidence as to whether this is the one that went to the market or it was somehow purely for internal use that CQB somehow, someway grabbed for its own purposes. So that's the concern I have with these cases that you cite. So I'm more than happy to go there with you because the premise of their whole argument, you'll see they say more likely than not over and over in their brief. That's their premise, is it's more than 50% likely. They're the ones that brought the statistics in. I would go there with you because we have no indication. They need to get over 50%. That premise of more likely than not just isn't there. You can't use the Fritch testimony to get there. He's just talking about that little window after quality control to release. You can't use the Troy testimony to get there because he's just talking about that last window of quality control. Nobody talks about the rest of the period and they have the burden. And so I'm happy to go there with you because the problem is theirs, not ours. Thank you, Mr. Drexler. Before I begin, I just wanted to correct something I said earlier about the claims that are being challenged now. Only 22 I think falls in that bucket of did not have Zorallic as one of the grounds. If you go back to the petition, which really I just did, Zorallic was part of the grounds for each of the other claims. 22 is a method of manufacturing and that one... I don't see it identified in the board's decision. Are you saying the board made an error? I will say I don't have the incitation. Just A7 for example. Or A35. I can only say that our petition included the Zorallic as part of those grounds. Standing here right now, I'm not understanding why that's not in the board's decision. Moving on to substance here. Actually, before I even touch that, regarding confidentiality, CQV does consider the customer names in the most recent declaration, in particular the name of the customer that has a contractual indemnity with CQV as confidential. You can talk more generally, just don't reveal the customer names. Does CQV sell Atomos in the United States? Through distributors. It does not directly sell Atomos in the United States. I want to touch briefly with the time that I have left. Council said that the manufacturing date is not corroborated. So the Troy Declaration does say that it is a 2007 lot based on the lot number of that sample. However, that's not entirely uncorroborated. The Fritz testimony includes testimony that the lot numbers include a two digit number that reflects the manufacturing date. The Merck certificates of analysis also reinforce that. Those are 2012 and 2011 certificates of analysis, but for those, those first two digits of those lot numbers reflect the manufacturing date, which is where we get the 2007 date. That is the remaining of my time, unless your honors have any other questions. Thank you for your time and we appreciate it. Okay, very good. Thank you. Case is submitted.